The opinion of the court was delivered by
Spencer, J.
This is a controversy as to the distribution of the proceeds of the “Red-Chute” plantation, seized under execution process in the above suit.
The facts out of which arises this controversy are as follows :
On January 21,1873, James B. Pickett sold to R. W. Daugherty (now deceased) the Red-Chute plantation, in Bossier parish, for $18,000, “paid as follows: five thousand dollars in cash, the receipt of which is hereby acknowledged; the balance in three equal annual installments;” the first due January 1,1875 ; the second January 2,1876 ; and the third January 1,1877 ; said three installments being represented by the vendee’s notes, duly paraphed: “In order to secure the payment of each of said notes at maturity, etc., the vendor retains, and the vendee 'grants, a special mortgage” on the property sold. On January 2,1877, James B. Pickett *1256 transferred by public act, and with full subrogation to plaintiff, the note ■due January 1, 1876.
The note due January 1,1875, was paid. Mrs. Kate B. Pickett, wife of said James B. Pickett, claims to hold the noté due January 1,1877, ■under circumstances hereafter to be stated.
James Marks bases his claim upon the following alleged facts:
He says that the 355000 cash payment acknowledged in said act was 'not in fact made; but that, in lieu of the cash, James B. Pickett accepted ■from Daugherty two drafts drawn by the latter on and accepted by James R. Arnold, one for 352550, and one for 352866 42, both dated January 21, 1873, the former due at sixty days, and the latter at later day; "that the draft for 352550 was indorsed without recourse by Pickett, the payee, and delivered to Boisseau & Ford for collection ; that it was protested for non-payment; that by authentic act Boisseau & Ford transferred it with full subrogation to Edwards & Holmes, represented by James R. Arnold, declaring in the act that it bore vendor’s privilege ■on the Red-Ohute plantation, which act was duly recorded, and bore date March 6,1873; that Edwards & Holmes transferred it on July 14, 1873, to J. U. & H. M. Payne & Co., who brought suit against Daugherty thereon in Bossier, and obtained a j udgment therefor of date September 23,1876, recognizing a special mortgage and vendor’s privilege therefor on said Red-Chute plantation, w'hich judgment was duly recorded in mortgage office. To this suit neither Pickett, Mrs. Pickett, nor Durham were parties. Marks claims under this judgment.
Durham, the plaintiff, claims to be. paid by preference over Mrs. Pickett, on the ground that her title and possession of the second note is simulated, and that James B. Pickett, who is plaintiff’s transferor, is the real owner, and can not participate until plaintiff’s note is satisfied. He opposes Marks on the ground that he has not now and never had any mortgage or privilege on the plantation to secure said draft. Mrs. Pickett claims concurrence with Durham, and opposes Marks on same grounds.
Marks opposes Durham on the ground that he acquired the note after its maturity from Pickett, and after Pickett had assigned the draft, and has only Pickett’s rights, and can not oppose him, Marks, therefore, because Pickett is the transferor of the draft, and could not concur with him, Marks. Marks opposes Mrs. Pickett on the same grounds as Durham does.
The judgment below decreed concurrence between Durham and Mrs. Tickett, and superiority to both over Marks. Durham and Marks appeal. There is a suggestion in the brief of counsel for plaintiff that Mrs. Pickett is not authorized to bring this suit. It is stated in the petition that her husband “ authorizes and assists her.” No exception *1257 was taken to her want of authority, and the question can not be now raised. C. P. 320, 321, 327, 333, 344 ; 4 Bob. 172 ; 5 B. 96.
We shall first consider the claims of Marks, under two aspects :
First — Did the drafts given by Daugherty to Pickett in lieu of the •cash payment acknowledged in the act of sale ever bear mortgage or privilege upon the Bed-Ohute plantation ?
Second — If they did, have these securities been lost or destroyed by want of registry, or by payment of the drafts ?
First, as to the existence of the mortgage and privilege.
It is manifest that no mortgage existed, because none was reserved •or granted in the act to secure any thing but the notes.
It appears that by agreement between Pickett and Daugherty the former accepted in lieu of the cash, $5000, acknowledged to have been received in the act, Daugherty’s two time drafts for $5416 42, drawn on and accepted by Jas. B. Arnold. The $2866 42 draft was duly paid; the $2550 draft was protested while in the hands of Boisseau & Ford, who swear they held it as agents, and for account of James B. Pickett. Pickett himself having accepted these drafts in lieu of the cash acknowledged to have been received in the authentic act, could not be heard in the absence of allegations of fraud, error, or violence, to deny, either as against Daugherty or any body else, the truth of his acknowledgment •of payment. As to him, and those claiming under him, that much, $5000, was paid. If he saw proper to accept property or drafts in lieu of the cash, it was another transaction. He must be considered as having exchanged the $5000 cash for the $5416 42 in time drafts. In other words, Daugherty paid the cash by discounting his drafts to Pickett.
This case can not be distinguished in principle from that of “Abat vs. Nolte’s Syndics,” 6 N. S. 636. In that case, as in this, the vendor of the land in the act of sale acknowledged receipt of the price. It was proved that, in point of fact, no cash was paid, but that the vendees gave the vendors a bill of exchange therefor.
The court say: “ It appears to us from the documents and evidence that the price of the sale was to be paid by a draft; that, trusting in the honor of the vendees, the vendors acknowledged the receipt of the price in the act of sale, and shortly after received the draft. After this they could not have any privilege, for the payment of the price ivas consummated according to the intention of the parties, and the form of the ■•act shows that the vendors had no idea of retaining a privilege. But, if ■even the original intention of the parties had not been that payment ■should be made by a draft, by receiving the draft in payment, the vendors extinguished their original claim.” This case is cited approvingly by •this court in “ Cammack vs. Griffin,” 2 A. 175, and its doctrine is in perfect consonance with reason and law. Every consideration of public *1258 interest and justice forbids the recognition of the opponent, Marks’, pretension. If the vendors of property, or their assignees, be permitted to falsify their own deliberate and solemn acts and declarations, spread upon the public records, that the whole or part of the price of property sold has been received in cash by them, and- to prove that they still have' the vendor’s privilege therefor, although avowing that they had voluntarily, without error, fraud, or violence, received another thing in lieu of the cash, what value would mortgage securities possess? What faith would public records be entitled to ? Pickett had no mortgage or vendor’s privilege on the Bed-Chute plantation for these drafts, and could, therefore, confer none on his transferees. The judgment of Payne & Co. vs. Daugherty, decreeing such against defendant therein, was clearly wrong. It may be binding as res adjudicata on Daugherty, but on no one else. It could not recognize what did not exist. Its registry created only a judicial mortgage against Daugherty.
Second. But there is still another insuperable objection to Marks’s-pretensions, and that is that the draft for $2550 was, before it reached' J. U. & H. M. Payne & Co., from whom Marks derives his claim, taken-up by James B. Arnold, the acceptor thereof, and thereby extinguished1 by confusion or payment. Arnold in his testimony says : “The interests of Edwards & Holmes and himself' were almost identified, he owning nearly the entire interest in the house.” In another place he says he took up this draft with money of the firm of Edwards & Holmes, represented by him, to whom Boisseau & Ford transferred it. Again, he says : “On the day of the protest of this draft it was paid by Edwards & Holmes to Boisseau & Ford, the holders thereof. This draft was transferred by Edwards & Holmes to James B. Arnold, who transferred the same to J. U. '& H. M. Payne &’Co., for advances made by them to-said Arnold.” Hence, it is clear that whatever rights J. U. & H. M. Payne & Co. had in this draft they derived from Arnold, its acceptor, in whose hands it was extinguished. Now, Arnold did have rights under this draft, but only by way of an action against Daugherty, for re-imbursement of the amount paid therein, and to secure himself in this right he took from Daugherty on the twenty-first January, 1873, a special mortgage on other lands than the “Bed-Chute” plantation, to secure him for his acceptance of these drafts. Neither Arnold nor 'his transferees, Payne & Co., could enforce that mortgage until Arnold had paid the drafts. He did pay them, and Payne & Co., by suing Daugherty to enforce this mortgage, as they did, necessarily admit such payment. The judge a quo did not err in decreeing Marks’s claim inferior to that of Durham and Mrs. Pickett.
It only remains to consider the contest as between Durham and Mrs. Pickett. We may premise by saying that it is matter of no- *1259 moment to plaintiff whether Mrs. Kate B. Pickett, the wife, or Mrs. Paulina Pickett, the mother, of James B. Pickett, owns the note; nor whether the transfer from Mrs. Paulina Pickett to Mrs. Kate Pickett is or not simulated; for if James B. Pickett is not the owner, then the note can not be excluded from concurrence with plaintiffs note, since it is only the transferor who is postponed to his transferee.
On July 3, 1866, Mrs. Paulina Pickett sold to her son, James B. Pickett, a valuable plantation known as “ Cash Point,” for $100,060, for which he gave five notes of $20,000 each, due annually thereafter from January 1, 1867. On May 5, 1871, J. B. Pickett produced these five notes before the recorder, and had the mortgage and vendor’s lien-securing them canceled.
Mrs. Paulina Pickett swears that in payment of a balance due her on this sale James B. Pickett delivered to her the note now held by opponent, Mrs. K. B. Pickett; swears that she had the actual and real possession and custody of the note from that time to March 1, 1878, when she sold and delivered it to her daughter-in-law for $5300, paiij in an accepted sixty-day draft for $2300, and a note for $3000, of which she furnishes copies ; that early in the year 1878 her son, J. B„ Pickett, tried to sell the note for her, but Without success. She admits frankly her own insolvency and her belief that her son is insolvent. There is no dispute as to the fact of the sale of Cash-Point place. It is also shown that Mrs. K. B. Pickett is separate in property from her husband, and is the owner of a large and valuable plantation, which she cultivates, and on the crops of which she has at times obtained advances for large sums. The question is, does the note held by Mrs. K. B. Pickett belong to her or to Mrs. Paulina Pickett or to James B. Pickett? We frankly confess that we look with suspicion upon these family transactions, these dealings between parents and children and husbands and wives, wherever there appears to be opportunity or temptation to gain some unjust advantage thereby. We have scanned the evidence in this record closely, and must say that it gives to these transactions an air of reality and truth which we do not feel at liberty to disregard.
Mrs. Paulina Pickett, now an old and venerable lady, tottering on the very verge of the grave, swears positively that her son delivered into her actual possession the note in question three years before its maturity, and that she continued so to hold it in satisfaction of said balance on “ Cash-Point ” place. The fact of this large indebtedness by the son is not disputed,' and it corroborates powerfully ner statement that he owed her. The fact of her surrendering the five notes to him, no-doubt at his solicitation, in order to cancel the mortgage, is not inconsistent with the idea that he owed her a balance of four or five thousand' dollars. It was but the natural promptings of maternal • affection, and *1260 what ninety-nine out of a hundred widowed and aged mothers would have done, for a son in whose house she was spending the remnant of her days ; nor is the fact that her son tried to sell the note for her of any significance, as he would naturally have been called upon to render such a service; nor do we attach more weight to the alleged large price, §5300, paid by Mrs. K. B. Pickett to her for the note, which then exceeded §6000 in amount. It should have brought the blush of shame to the cheeks of her daughter to have offered less for it than the mother gave for it. The evidence does not satisfy us that James B. Pickett is the owner of the note. On the contrary, it satisfies us that he transferred it to his mother in 1874, and, so far as concerns plaintiff, it is matter of no mompnt whether she or Mrs. K. B. Pickett now owns it.
In either case, the judgment appealed from is correct, and it is affirmed at costs of appellants.